IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 17, 2023 Session

## DAEMON SHAUN KEY v. CAILEY MARJORIE GONZALES

Appeal from the Chancery Court for Madison County
No. 72081     James F. Butler, Chancellor
_____

### No. W2021-01465-COA-R3-CV
_____

Father appeals the denial of his petition in opposition to a proposed relocation by Mother and his petition to change custody of the children. After considering the testimony of over ten witnesses, the trial court ruled that the children's best interests were served by allowing Mother to relocate and by her remaining the children's primary residential parent. The trial court also awarded Mother considerable attorney's fees, including fees incurred in defending against a dependency and neglect action that had eventually been dismissed, with the related visitation and custody issues transferred to the trial court. Discerning no abuse of discretion in the trial court's decisions, we affirm. We deny, however, Mother's request for attorney's fees incurred on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which KENNY ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

David Camp, Jackson, Tennessee, for the appellant, Daemon Shaun Key.

J. Noble Grant, III, Jackson, Tennessee, for the appellee, Cailey Marjorie Gonzales.

### OPINION

#### I. FACTUAL AND PROCEDURAL BACKGROUND

The parties Plaintiff/Appellant Daemon Shaun Key ("Father") and Defendant/Appellee Cailey Marjorie Gonzalez ("Mother") were divorced by the Madison County Chancery Court ("the trial court") in 2016. A permanent parenting plan was entered August 23, 2016, designating Mother as the primary residential parent of the parties' two

minor children—Jackson, born in 2011, and Sophia, born in 2013.

Mother hand-delivered a letter to Father giving notice of her intention to relocate with the children from Parsons, Tennessee, to Nashville, Tennessee, in February 2019. Father filed a petition in opposition to Mother's intent to relocate in the trial court on March 22, 2019, and requested a modification of the parenting plan to designate himself as the primary residential parent. Mother then filed a petition seeking approval of her relocation, modification of the parenting plan and child support, civil contempt,[1] and a restraining order on April 15, 2019.

In the summer of 2019, Father took the children to a therapy group, as discussed in detail below. As a result of their sessions, the therapy group made a referral to the Tennessee Department of Children's Services ("DCS") regarding possible abuse by Mother's husband, Vincent Gonzales ("Stepfather"). In August 2019, DCS filed a petition to adjudicate the children dependent and neglected in the Henderson County Juvenile Court ("the juvenile court").[2] Therein, DCS alleged at least two behaviors where Stepfather had acted inappropriately with Jackson, despite Jackson asking him to stop: a single instance involving hair clippers as discussed in detail *infra*, and multiple instances where Stepfather throws cold water on Jackson while he is in the shower. The petition further alleged that Stepfather's son, who was a few years older than Jackson, was violent with Jackson "for fun" and that Mother did not prevent the violence or the conduct of Stepfather despite Jackson asking her to. Both children also reported an incident concerning Sophia where Stepfather "grabbed [] Sophia [], when she was running down the hall, threw her on the couch, held her down, pulled her pants down, and kissed her on the buttocks." Based on these allegations, DCS asked that the children be removed from Mother's custody and placed either with Father or with DCS, and that Mother be permitted only supervised visitation with the children. An ex parte protective custody order was entered on August 2, 2019, placing the children in Father's custody and providing for supervised visitation with Mother; Stepfather was ordered to have no contact with the children.

The relocation matter in the trial court was suspended while the dependency and neglect action proceeded. A preliminary hearing occurred in the juvenile court on August 6, 2019. After hearing the proof, the juvenile court ordered that the children would remain in Father's custody and that Mother would be permitted eight hours of weekly visitation supervised by the children's maternal grandmother. Again, Stepfather was not permitted contact with the children. Another hearing was held on November 20, 2019. During this hearing, DCS announced a conditional dismissal of the petition without prejudice.[3] The

---

[1] This was the first of several contempt petitions that the parties filed against each other. As noted, *supra*, the trial court found Father in contempt only as it related to his failure to pay a credit card balance as required by the divorce decree. All other contempt allegations were dismissed and have not been appealed.

[2] Although Mother lived in Decatur County, Father lived in Henderson County.

[3] A DCS worker testified that her decision to dismiss the dependency and neglect action was two-

conditions for dismissal were as follows: (1) temporary custody was to remain with Father; (2) Stepfather was to have no visitation with the children; and (3) the issues of custody and visitation and any "further modifications" would be transferred to the trial court to be decided with the relocation matter. Visitation was to remain as previously ordered. A written order reflecting DCS's conditional dismissal was entered on January 15, 2020. Thus, jurisdiction over the relocation matter returned to the trial court in January 2020.

Over the course of the new few months, the trial court entered several orders giving Mother additional visitation with the children. On April 13, 2020, in particular, the trial court entered an order expanding Mother's visitation with the children such that Mother was permitted Wednesday night visitation for three hours and overnight weekend visitation with the children in the home of the maternal grandmother or Mother's brother. The no contact order prohibiting Stepfather from having contact with the children remained in effect. On December 7, 2020, the trial court entered an order allowing Stepfather to have contact with the children "only at counseling sessions with Veldon 'Doc' Reedy."

The relocation and change in custody requests were eventually heard by the trial court in July 2020 and August 2021. Much of the testimony concerned the catalyst for the dependency and neglect action. Father testified that around the time the relocation dispute began, the children began experiencing anxiety about returning to Mother. When Father attempted to discuss these issues with Mother, he testified that she "turned and walked away" and would not discuss it with him. Mother denied that Father ever informed her that he was taking the children to counseling and testified that she only learned of it once DCS initiated the dependency and neglect action.[4]

Regardless, Father took the children for counseling with Positive Living Group beginning with Jackson in the summer of 2019. Caleb Vivio, a master's-level mental health counselor with Positive Living Group, testified that he began seeing Jackson in July 2019. Mr. Vivio testified that he and his colleagues decided to make a DCS referral after certain troubling allegations were communicated to them through Father. In particular, Mr. Vivio testified that Father informed him that Stepfather had trimmed Jackson's body hair underneath his underwear without consent.[5] Mr. Vivio was concerned by this contact

fold: (1) due to her feeling that the children were safe; and (2) due to bullying by Mother's counsel.

[4] The counselors testified that Mother was not involved in the counseling in any manner and that they were not informed that the parties were litigating a custody dispute. Mother testified that after the removal of the children, she attempted to participate in therapy and to glean information from Positive Living Group, but her efforts were rebuffed.

[5] Specifically, Mr. Vivio testified that he reported as follows, quoting his notes:

"[C]lient stated that [S]tepfather brought client into the bathroom to trim his hair using clippers. Client stated that [S]tepfather had client strip to his underwear and showed him how to 'trim his body hair.'" That's in quotes. "After running the clippers over client's arms and legs, [S]tepfather pulled down client's underwear and ran the clippers over his behind. Client repeatedly asked [S]tepfather to stop, but [S]tepfather ignored him."

- 3 -

because it involved "touching an area the underwear covers even though the child was asking him to stop." When Mr. Vivio later spoke with Jackson, he disclosed that he was scared to return to Stepfather's home.

Father also informed Mr. Vivio about an incident wherein Stepfather pulled down Sophia's underwear and kissed her on the bottom. Lekichia Franklin, a licensed master's-level social worker formerly with Positive Living Group, testified that she met with Sophia beginning in August 2019, and that she also disclosed this incident to her. During this session with Sophia, outside of Father's presence, Sophia stated that Stepfather chased her around the house, "pushe[d] her on the couch and tries to lift her behind in the air," and touched her underwear area. Sophia stated that this incident occurred once.

Based on both children's disclosures, Positive Living Group made a referral of these statement to DCS, which launched an investigation. Ms. Franklin testified that she merely made the referral but did not have an opinion on whether abuse occurred. Still, she testified that both children expressed a preference to live with Father and testified that Stepfather is mean to Jackson. Indeed, the treatment of Jackson by Stepfather had caused Mr. Vivio and Ms. Franklin to diagnose Jackson with Post-Traumatic Stress Disorder related to the Stepfather's conduct.

Following the filing of the ex parte order of protection, Mother's visitation was supervised only. Linda Lipscomb, a volunteer court-appointed special advocate, was present for some of the visitation with Mother. She testified that despite the no-contact order prohibiting Stepfather from having contact with the children, Mother "pass[ed] messages" from Stepfather to Jackson asking him to come home to Mother. Ms. Lipscomb later clarified that this was a conversation between Mother and Jackson in which Mother promised that if Jackson came home, Stepfather promised that "nothing else would happen." Ms. Lipscomb thereafter recommended that the supervised visitation be changed to therapeutic visitation. Ms. Lipscomb performed a home visit that she said was concerning, as Mother mostly cried and Stepfather did most of the talking. Otherwise, Ms. Lipscomb testified that Mother's home was appropriate. Ms. Lipscomb also testified that the children told her on multiple occasions that they are scared of Stepfather and do not wish to live with Mother for this reason.

William Beyer, a licensed psychological examiner and professional mental health advisor, performed examinations of Mother and Stepfather in conjunction with the dependency and neglect matter. Mr. Beyer testified that Stepfather possibly suffers from, inter alia, narcissistic personality disorder, is attention seeking, and may not be able to control his anger. Still, he testified that these were not definite diagnoses and that he

---

Mr. Vivio later clarified that this report came from Father, not directly from Jackson. He only spoke with Jackson about these incidents at a later session.

believed Stepfather was capable of change. Mr. Beyer also testified that Mother may be overly conforming to the wishes of others.

Mr. Beyer, testified, however, that he did not believe that Stepfather was guilty of sexual grooming in any manner. Instead, he testified that what occurred seemed to be the opposite of sexual grooming, in that the behavior did not encourage a relationship, but was "horseplay, aggravating, [and] irritating" to the children. Mr. Beyer further testified that Stepfather was able to recognize his immature behaviors and could address those behaviors. As such, he concluded that there was minimal risk to the children if Mother and Stepfather resumed unsupervised contact with the children. And Mr. Beyer testified that there was nothing in his evaluation to cause him to believe that Stepfather could not effectively parent.

Velden Reedy, a licensed clinical social worker, testified that he had completed over twenty visits with the children, parents, and stepparents by August 27, 2021.[6] In his initial testimony, Mr. Reedy testified that he was not concerned about Mother's willingness to protect the children and that a twelve-week parenting and anger management class could be helpful for Stepfather in dealing with some of the issues outlined by Mr. Beyer. In his testimony over a year later, Mr. Reedy testified that the children had a healthy relationship with both Mother and Stepfather. In particular, after two counseling sessions with the children and Stepfather together, Mr. Reedy testified that the children appeared to be comfortable around Stepfather. For example, Jackson, upon seeing Stepfather for the first time, stated that he missed him and became emotional. At Mr. Reedy's suggestion, Stepfather apologized to Jackson and Jackson accepted his apology. Jackson had expressed a desire that visitation "go back like they used to be" before the court proceedings began.

Father testified that he opposed Mother's relocation primarily on the basis that the distance would prevent him from protecting his children from Stepfather's abuse,[7] as Father believes that Mother is unlikely to do so. Father therefore testified that the current visitation plan, in which Mother was only permitted overnight visitation at the home of a family member, should be ordered permanently.

Mother denied that any of what the children experienced that led to the DCS investigation was abuse. Instead, she testified that the incidents may have occurred, but were taken out of context. Specifically, Mother testified that she knows that the hair trimming and cold-water incidents occurred but that the situations did not occur as stated and were harmless antics. And Mother testified that the children never told her that Stepfather's behavior hurt them or made them fearful. Mother essentially testified that the children's alleged fear of Stepfather was due to coaching by Father in an effort to interfere

---

[6] Mr. Reedy testified twice, once in July 2020 and once in August 2021.
[7] Father testified that Stepfather was also aggressive toward him during child exchanges.

with her ability to parent the children.[8] Indeed, this was not the first time that Father had interfered with Mother's parenting time, as he admitted that a few weeks before receiving notice of the relocation, he contacted the police to press custodial interference charges against Mother; the parenting plan, however, provided that the time was Mother's.[9] After Father was informed by the police that Mother was abiding by the plan, he did not press charges.

Mother also characterized the violence with Stepfather's child against Jackson as "roughhousing" and testified that she had repeatedly intervened to protect Jackson, but that this behavior is typical in sibling relationships, including between Jackson and Sophia. Still, she testified that, based on DCS's recommendations, she and Stepfather completed a psychological evaluation with Mr. Beyer, an intensive 12-week parenting class, and counseling with Mr. Reedy. Mother also testified as to her concerns with Father's parenting skills, as Sophia had suffered injuries in Father's custody after falling out of a moving car. Mother also testified that Jackson informed her that Father bit him as a punishment after she noticed bruising on his arm.[10]

Mother also testified about her desire to move to Nashville. According to Mother, she was the primary care provider for the children both during the parties' marriage and after the divorce until the issuance of the ex parte order. Indeed, the proof shows that she was also the primary source of financial support for the children until the change in custody, as Father did not pay child support under the parenting plan.[11] Mother testified, however, both her and Stepfather have better options for career advancement in Nashville. For Mother in particular, she testified that she would keep her same job as a nurse, but transfer to Nashville; however, there is the opportunity to advance in Nashville that is not present in West Tennessee. Mother testified that by advancing her and Stepfather's careers, she hoped to provide the children with a better life. Mother also testified that she had investigated the Nashville area, and if relocation was permitted, planned to move to the Fairview area in Williamson County, about an hour from Father's current home in Henderson County, Tennessee. According to Mother, the schools in that area are good, as they have smaller class sizes and more extra-curricular activities. Mother was particularly happy about the extra-curricular opportunities because her "two children are very different and them being able to do things that are more tailored to their personalities is important for them to express themselves and grow." Mother further testified that the move would

---

[8] Other witnesses involved with the children consistently testified that they did not believe that the children had been coached.

[9] Father claimed that he was entitled to the time due to a previous oral agreement after several snow days in which Mother kept the children.

[10] Pictures of the bruising were entered as exhibits.

[11] Father admitted that he had never paid child support following the divorce, as the parenting plan stated that he would not do so until he graduated from school as a registered nurse. But Father did not revisit the issue in May 2019 when he graduated. Instead, by August 2019, DCS had acted to place the children in Father's custody.

put her closer to her brother, who is close with the children, as well as Stepfather's son.

Mother admitted, however, that her plans to move had been placed on hold due to the dependency and neglect action. Instead of focusing on the move, Mother testified that she first wanted to focus on the return of her children. As such, no concrete plans to move were on the horizon. And Mother testified that if she was not permitted to relocate with the children, she would not relocate at all.

Stepfather confirmed that he completed all of the recommendations that DCS made, including anger management classes, a psychological evaluation, an intensive parenting class, and counseling both individually and as a family with Mr. Reedy. Other than the counseling, however, Stepfather testified that he did not believe he needed help with his parenting. Stepfather denied any anger issues or aggressive behavior toward Father. Stepfather also testified that he apologized to Jackson about the cold-water incidents, which Stepfather described as a prank he plays on his own child and that is played on him by the children, that Jackson did not have a problem with the hair trimming incident, and that he never kissed Sophia's private areas.

Stepfather's desire to relocate was mostly financial. He testified that prior to moving to Parsons to take care of a family member,[12] he earned approximately $60,000.00 per year in sales. He has not been able to earn nearly that amount in West Tennessee, and only currently earns $12 per hour at a facility that builds deer blinds. Stepfather testified that he has looked for better employment near Jackson, Tennessee, but has found none that paid better or that would allow him to see his older son on weekends. Stepfather further testified that his contacts for obtaining employment are in Nashville and that some have informed him that they could find him suitable employment in Nashville following the relocation.

The trial court entered its order on November 12, 2021. The order incorporated the trial court's September 20, 2021 oral findings of fact and conclusions of law. The trial court found that Father's "main issue" was with Stepfather and not Mother, and that Father failed to prove a material and substantial change of circumstances sufficient to justify a modification of the original parenting plan. The trial court granted Mother's request to relocate with the children and dissolved the no-contact order as to Stepfather. The permanent parenting plan entered by the trial court designated Mother as the children's primary residential parent and granted Father visitation every other weekend and for large portions of the summer.[13] Father was held in civil contempt for failure to pay his portion of the parties' shared credit card balance as set out in the parties' marital dissolution agreement. Father was therefore ordered to reimburse Mother for the expense or risk further punishment. All other matters were dismissed. The trial court granted Mother's

---

[12] Stepfather admitted that after this move, he was jailed for failure to pay child support. He testified that he did not have the money to pay support because he was caring for a family member.

[13] Under the trial court's plan, Mother was awarded 268 days, while Father was awarded 97 days.

request for her attorney's fees, directing her counsel to submit an affidavit of time and expenses and giving Father until October 31, 2021, to file any objections.

Father filed his notice of appeal on December 17, 2021. Father then filed an objection to Mother's attorney's fees request on January 10, 2022. The trial court entered its order awarding Mother $52,640.00 in attorney's fees and $3,585.42 in expenses on December 15, 2022.[14]

## II. ISSUES PRESENTED

On appeal, Father challenges the trial court's finding that granting the relocation petition was in the children's best interests and denial of Father's petition for custody. He also asserts that the trial court abused its discretion in awarding attorney's fees to Mother. In the posture of appellee, Mother seeks an award of attorney's fees incurred on appeal.

## III. STANDARD OF REVIEW

The trial court heard this case sitting without a jury. Accordingly, we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial courts conclusions of law, and our review is de novo. *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006) (citing *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000)). Regardless, "we are mindful that trial courts are vested with wide discretion in matters of child custody and that the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Johnson v. Johnson*, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993)). This deference extends to decisions under the parental relocation statute: "[i]nasmuch as parental relocation decisions involve 'significant' trial court discretion, these decisions should be reviewed pursuant to an abuse of discretion standard." *Hall v. Hall*, No. M2021-00757-COA-R3-CV, 2022 WL 1642700, at *3 (Tenn. Ct. App. May 24, 2022). "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

## IV. ANALYSIS

### A.

---

[14] Although the trial court designated its November 12, 2021 order as final under Rule 54.02 of the Tennessee Rules of Civil Procedure, this Court entered a show cause order indicating that Rule 54.02 was not properly invoked in this case. The trial court thereafter entered the December 15, 2022 order awarding attorney's fees. As such, the matter is now finally and fully resolved, and this Court has subject matter jurisdiction to consider the relocation and custody issues, as well as the attorney's fees issue.

The genesis of this dispute involves Mother's request to relocate with the children more than fifty miles from her current residence. Father timely filed a petition in opposition to Mother's proposed relocation pursuant to Tennessee's parental relocation statute, Tennessee Code Annotated section 36-6-108(b). As such, there is no dispute that the trial court was required to determine whether Mother should be allowed to relocate with the children upon consideration of the non-exclusive best interest factors contained in section 36-6-108(c)(2). Although the trial court did not specifically reference section 36-6-108(c)(2) in its ruling, it made detailed factual findings that mirror the statutory best interest factors. As such, we will consider each factor, the trial court's ruling, and Father's argument thereon in turn.

We begin with the factor concerned with "[t]he nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child's life[.]" Tenn. Code Ann. § 36-6-108(c)(2)(A). With regard to this factor, the trial court found that Mother was the primary caregiver of the children both prior to and after the parties' divorce. The trial court further found that the children have a strong bond with Mother.

On appeal, Father asserts that he has also been actively involved in the children's lives. Moreover, he asserts that the trial court's finding fails to consider the children's interactions with Stepfather and his child, who Father asserts have acted inappropriately toward the children. As such, Father asserts that Mother's "failure to protect" the children from Stepfather and his son supports a finding that relocation is not in the children's best interests.

The bulk of Father's argument as to this factor, and indeed many of the factors in dispute, concerns Father's characterization of Stepfather's behavior as inappropriate and abusive, as well as his assertion that Mother would not protect the children from the abuse. In support of this description, Father submitted his own testimony, as well as the testimony of various experts and lay witnesses, regarding Mother's failure to protect the children from Stepfather's narcissistic and abusive behavior, as well as the bullying by Stepfather's son. To allow the children to move further away from Father, he contends, leaves them without his protection against the negative behavior rampant in Mother's home.

After considering Father's proof and Mother's counter-proof, however, the trial court simply did not view Mother's and Stepfather's behavior in the same way as Father. Instead, the trial court found that Mother would protect the children if they needed to be protected. In making this finding, the trial court appeared to rely in large part on the testimony of Mother and Mr. Reedy that Mother's home, with Stepfather and his son present, did not pose a risk of harm to the children and that they were comfortable with

- 9 -

Stepfather.[15] In our view, then, a large part of the trial court's finding that Mother would protect the children rests on the trial court's assessment of the witnesses' credibility. When reviewing findings that hinge on credibility, this Court is required to afford the trial court considerable deference, as "trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692–93 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Clear and convincing evidence eliminates any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)).

Here, evidence was presented both for and against a finding that Stepfather's behavior was inappropriate.[16] After fully considering this evidence, the trial court found that Stepfather's behavior, while sometimes "immature," was not inappropriate such that he could not be around the children. Instead, the trial court found that Mother and Stepfather have dealt with the immature acts against the children "appropriately" and "have satisfied the court that those things will not happen in the future." The trial court further found that Mother would protect the children if ever there was something to protect them from. Given the deference we must give to findings that rest on credibility, we must conclude that the evidence does not preponderate against the trial court's finding that the children were safe in the home of Mother and Stepfather. As such, we agree with the trial court, that prior to the initiation of the dependency and neglect action, Mother was the primary caregiver of the children. This factor therefore favors Mother's request to relocate.

We next consider the factor concerned with "[t]he age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child[.]" Tenn. Code Ann. § 36-6-108(c)(2)(B). With regard to this factor, the trial court found that the children are at an age where they can readily adjust to the move and that the move will not have an adverse effect on their physical, educational, or emotional development. Once again, Father asserts that the trial court's ruling fails to take into account how the relocation will cause "isolation of the minor children with a narcissistic Stepfather and conformist mother[.]" Again, as previously discussed, Father has not shown that the trial court erred in finding that Stepfather did not pose a danger to the children or that Mother would not properly protect them. So Father has not met his burden to show

---

[15] The trial court also noted that Mother and Stepfather followed every recommendation of DCS after custody was placed with Father, including anger management classes for Stepfather, parenting classes, and counseling. Moreover, the trial court noted that Father himself testified that Mother could care for the children properly and protect them.

[16] None of the non-party witnesses testified that Stepfather had engaged in grooming or any kind of sexually inappropriate behavior. One witness testified that his behavior was essentially the opposite.

- 10 -

that the evidence preponderates against the trial court's finding as to this factor.

Section 36-6-108 also asks that the trial court consider "[t]he feasibility of preserving the relationship between the nonrelocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties[.]" Tenn. Code Ann. § 36-6-108(c)(2)(C). As to this factor, the trial court found that the move of approximately 100 miles would not impact the children's relationship with Father as the parties can meet halfway between their homes. The trial court also noted that the children have ample other means to communicate with Father during Mother's parenting time. On appeal, Father asserts that this was error because Mother had not identified a specific residence where she intended to move and "considering that one of [M]other's objectives is to reduce [F]ather's parenting time . . . the feasibility of the relocation is not good." Father's brief does not cite any specific portion of the evidence in support of his claim that Mother's objective in moving was to reduce his parenting time. Under Rule 6 of the Rules of the Court of Appeals of Tennessee, the appellant is required to support his or her arguments with "a statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found." Tenn. R. Ct. App. 6(a)(4). "'Judges are not like pigs, hunting for truffles' that may be buried in the record[.]" *Cartwright v. Jackson Cap. Partners, Ltd. P'ship*, 478 S.W.3d 596, 616 (Tenn. Ct. App. 2015) (internal citation omitted) (citing *Flowers v. Bd. of Pro. Resp.*, 314 S.W.3d 882, 899 n.35 (Tenn. 2010)). Instead, the trial court noted that Mother and Stepfather cited better job opportunities as their objective in moving to Nashville. As such, the trial court correctly found that this factor favored relocation.

The trial court also considered the preference of Jackson. *See* Tenn. Code Ann. § 36-6-108(c)(2)(D) (giving the trial court discretion to consider the preference of a child under twelve). Specifically, the trial court noted that Jackson expressed to Mr. Reedy that he wished to return to the prior custody arrangement, which involved remaining primarily with Mother and have visitation with Father. On appeal, Father notes that other witnesses testified that the children expressed a preference to live with him. Given conflicting testimony on this issue, the trial court was entitled to credit that testimony that it deemed most credible and accurate given the passage of time. *Kelly*, 445 S.W.3d at 692–93. Clearly, the trial court considered Mr. Reedy, who had worked with the children immediately prior to the final trial date, to be very credible on this issue. *See Wells*, 9 S.W.3d at 783. This factor therefore weighs in favor of allowing the relocation.

The next factor questions "[w]hether there is an established pattern of conduct of the relocating parent, either to promote or thwart the relationship of the child and the nonrelocating parent[.]" Tenn. Code Ann. § 36-6-108(c)(2)(E). The trial court made detailed findings regarding this factor, much of which was unfavorable toward Father:

> There has been no evidence that Mother has attempted to thwart the relationship between Father and the children. Father, on the other hand,

obtained an ex parte custody order without notice to [M]other, sent the children to counseling without telling Mother, and has sent the police to pursue a warrant against Mother for custodial interference when Mother had the children at dinner in Jackson, Tennessee, on her scheduled time. Father's acts were in violation of the [parenting plan], and he ultimately did not pursue them although it ruined Mother's evening with the children.

Once again, Father points only to his allegations against Stepfather and Mother's alleged refusal to protect the children from him, which has already been addressed. Importantly, Father does not contend that the evidence does not support the trial court's findings as to the multitude of ways in which Father has attempted to interfere with Mother's parenting.[17] This factor therefore heavily supports Mother's effort to relocate with the children.

Another factor involves "[w]hether the relocation of the child will enhance the general quality of life for both the relocating parent and the child, including, but not limited to, financial or emotional benefit or educational opportunity[.]" Tenn. Code Ann. § 36-6-108(c)(2)(F). The trial court found that the move would enhance Mother's quality of life in that she could advance in her employment, which the trial court found to be a reasonable goal. The trial court further found that Stepfather's career opportunities would be better in Nashville. Thus, the trial court found that "[t]he proposed relocation would allow Mother to better provide for the children, particularly since Father does not pay child support under the original parenting plan." And Mother testified without dispute that the schools and activities in the area were better for the children.

On appeal, Father takes issue with Mother's testimony about the quality of life in Nashville as being to general and conclusory. Father also points out that Mother did not have a better job lined up in Nashville, nor a specific residence. Instead, Father points out that Mother testified that she halted her plans to move when the custody of the children became an issue. Respectfully, we fail to see how Mother's decision to focus on the custody and well-being of her children during these highly acrimonious proceedings is in any way a mark against her. While in a typical case, a parent seeking to move will often provide a more detailed plan for the move, here Mother was not unreasonable in focusing on the ongoing legal dispute rather than proceeding headlong with her relocation plans while the

---

[17] Elsewhere in his brief, Father takes issue with the trial court's finding that he obtained the ex parte order removing the children from Mother's custody. Instead, Father asserts that the proof is undisputed that DCS initiated the dependency and neglect action after a referral from the Positive Living Group. While it is true that the referral did not come from Father, the catalyst for the entire series of events was Father's decision to take the children to counseling after Mother gave notice of her desire to relocate. And despite Father's insistence on appeal otherwise, the trial court clearly credited Mother's testimony that Father never attempted to notify her about his decision to take the children to counseling, in violation of the parties' parenting plan. *See Kelly*, 445 S.W.3d at 692–93. So then, Father's decision to unilaterally take the children to counseling spiraled into years of proceedings and, as discussed in detail, *infra*, tens of thousands of dollars in attorney's fees.

custody of her children was unsettled. Moreover, the trial court found that the career opportunities for Mother and Stepfather were better in Nashville, which would allow them to earn more money. This is especially relevant here where Father, though gainfully employed for some time, has paid no child support. As such, we agree that this factor favors relocation in this case.

The trial court also considered "[t]he reasons of each parent for seeking or opposing the relocation[.]" Tenn. Code Ann. § 36-6-108(c)(2)(G). We have previously discussed Mother's reasons for moving, which the trial court found to be reasonable. The trial court noted that Father's objections to the move largely stemmed from his concern that Mother would not protect the children and that his parenting time would be reduced. The trial court, however, rejected Father's concerns, noting again its finding that Mother would protect the children. The trial court did acknowledge that Father's parenting time would be reduced as a result of the move, but found that it was still in the children's best interests to move, given that Father had other means to communicate with the children.

On appeal, Father duplicates his arguments concerning Mother's general testimony about the opportunities in Nashville, as well as his concern over the protection of the children. As we have already addressed these issues, we will not tax the length of this Opinion with further analysis of those arguments. Moreover, we note that Stepfather's testimony concerning the better job opportunities for him in Nashville was specific and optimistic. The difference in income that Stepfather was likely to experience was significant. The evidence therefore does not preponderate against the trial court's finding that this factor favors relocation.

Section 36-6-108(c)(2)(H) also states that the trial court shall consider "[a]ny other factor affecting the best interest of the child, including those enumerated in § 36-6-106(a)." Of course, Tennessee Code Annotated section 36-6-106(a) sets forth the best interest factors to be considered in making a custody determination regarding a minor child. Here, Father indeed filed a petition to be named the children's primary residential parent. In its order, the trial court made findings as to each of the section 36-6-106(a) factors in denying Father's petition to change custody. Although Father designates the denial of his petition to change custody as an issue on appeal,[18] his argument does not specifically address this issue or the section 36-6-106(a) factors. Instead, after citing section 36-6-108(c)(2)(H), Father asserts that the factors "addressed hereinabove[,]" presumably factors (A) through (G), "adequately state the reasons for [F]ather's opposition to relocation and his request to be designated primary residential parent." So then, Father has chosen not to address the section 36-6-106(a) factors in any detail in his brief. We therefore likewise decline to do so. *See* ***Childress v. Union Realty Co.***, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) ("[W]hen a party raises an issue in its brief, but fails to address it in the argument section

---

[18] Father framed his first issue as follows: "The trial court erred when it denied the Father's petition in opposition to Mother's relocation and the Father's petition to be awarded custody of the minor children."

of the brief, we consider the issue to be waived.").[19]

In sum, Father has not shown the trial court's factual findings as to the children's best interest under section 36-6-108(c)(2) are unsupported by the record on appeal. Nor has he met his burden to show an abuse of the trial court's discretion in its overall finding that the factors at issue weigh in favor of allowing Mother to relocate to Nashville notwithstanding that the relocation will result in a reduction of Father's parenting time. So we affirm the trial court's decision to dismiss Father's petition in opposition to Mother's relocation request and his petition to be named primary residential parent.[20]

**B.**

Father next asserts that the trial court abused its discretion in awarding Mother attorney's fees. Here, the trial court awarded Mother the entirety of her claimed fees and expenses, totaling $56,225.42, after finding that Mother's fees and expenses were reasonable and necessary.

The parental relocation statute states in relevant part that "[e]ither parent in a parental relocation matter may recover reasonable attorney fees and other litigation expenses from the other parent in the discretion of the court." Tenn. Code Ann. § 36-6-108(f). "[A]ttorney's fee awards in relocation matters are typically reviewed for an abuse of discretion." *Hall v. Hall*, No. M2021-00757-COA-R3-CV, 2022 WL 1642700, at *8 (Tenn. Ct. App. May 24, 2022) (citing *Lima v. Lima*, No. W2010-02027-COA-R3-CV, 2011 WL 3445961, at *9 (Tenn. Ct. App. Aug. 9, 2011)).

On appeal, Father raises the same objections to the attorney's fees awarded that he did in the trial court: that he should not be required to pay any fees incurred during the pendency of the dependency and neglect action and that certain fees are excessive, duplicative, or vague.

The trial court rejected Father's contention that Mother could not recover attorney's fees incurred in defending against the dependency and neglect action on the basis that the fees incurred in that action "were intimately tied to the [c]hancery court proceeding and ultimately dismissed with a deferral to the [c]hancery proceeding." Tennessee law indeed provides that notwithstanding the filing of a dependency and neglect action, the juvenile court may transfer jurisdiction to "another juvenile, circuit, chancery, or general session court exercising domestic relations jurisdiction[.]" Tenn. Code Ann. § 37-1-103(c) (noting that this provision "does not establish concurrent jurisdiction for any other court to hear

---

[19] Moreover, nothing in Father's appellate brief addresses the trial court's finding that Father failed to prove a material change in circumstances to justify his request for a change in custody. This is a "threshold" inquiry for purposes of an effort to modify a parenting arrangement. *Armbrister v. Armbrister*, 414 S.W.3d 685, 705 (Tenn. 2013).

[20] Father does not appeal the parenting plan put in place by the trial court should Mother relocate.

juvenile cases, but permits courts exercising domestic relations jurisdiction to make custody determinations in accordance with this part"). Here, the juvenile court, with the agreement of the parties, dismissed the dependency and neglect action, but kept in place significant restrictions on Mother's parenting time. The juvenile court clearly intended the trial court to resolve the remaining issues of visitation and custody in the relocation proceeding. Thus, the juvenile court transferred at least a portion of what was at issue in the dependency and neglect action to the trial court for final resolution.

On appeal, Father cites no legal authority to undermine the trial court's conclusion that it was permitted to consider fees incurred in the juvenile court proceeding prior to the transfer to the trial court. Generally, we do not consider arguments that are not supported by citation to relevant legal authority. *See* **Sneed v. Bd. of Pro. Resp. of Sup. Ct.**, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Instead, Father points out that he did not initiate the juvenile court matter, as DCS initiated that action on the basis of a referral by the children's counselors. The trial court found, however, that Father took the children to Positive Living Group without Mother's notice or consent, in violation of the parties' parenting plan.[21] Thus, Father's actions were the catalyst for the entire series of events that lead to the DCS action. While in some cases a parent may certainly be justified in initiating a dependency and neglect action when abuse is suspected, the trial court found that was not the case in this particular instance. Still, Father certainly capitalized on the DCS action, as he continuously cited the allegations at the heart of the DCS investigation as a basis for denying Mother's efforts to relocate and to be named primary residential parent of the children. Given Father's failure to cite any authority in support of his arguments, we cannot conclude that the trial court abused its discretion in determining that it could award fees incurred during the dependency and neglect proceeding following the transfer of the custody and visitation issues to the trial court for final resolution along with the relocation issue.

Father also takes issue with certain specific time and expense entries submitted by Mother's counsel. Some time entries, such as over ten hours in preparation for a deposition, thirteen hours for trial preparation, and twenty-two hours for trial, Father asserts are excessive. But the trial court specifically found that these proceedings "required a significant dedication of time and labor by Mother's attorney to protect her interest." So we conclude that the trial court did not abuse its discretion in awarding attorney's fees consistent with these entries.

Next, Father asserts that some time entries were not proper, as they involved work that he asserts was unnecessary. For example, he assets that one hour of work on a subpoena should be stricken because the trial court later ruled that the witness was required to testify.

---

[21] The parties were required to make major health care decisions jointly under the parenting plan.

Father also objects to the 3.2 hours spent on the deposition of a witness who did not testify at trial. Regardless of Father's objections, there does not appear to be a dispute that this work was performed by Mother's counsel in furtherance of Mother's interests in this case. In the absence of any cited authority suggesting that these were not proper, we cannot conclude that the trial court abused its discretion in including these fees.

Father's final issue with the time entries are that they include two separate entries for telephone conferences with clerks in Maury County and Henderson County. Father asserts that these entries were inappropriate because the present action was filed in Madison County. The submitted time entries do include an entry of .4 hours for communications with the Maury County Circuit and Chancery Courts, for a total expense of $32.00. But the entries indicate that the purpose of this call was to glean information about a child support contempt matter against Stepfather. As such, this communication was clearly related to this case. The entries also reflect a .3-hour conference with the Leigh Milam, the Henderson County Chancery Court clerk, totaling $75.00 in attorney time. After Father objected to this entry in the trial court, Mother's counsel explained that he could not "recall the exact nature of the communications with Leigh Milam," but that counsel "believes these communications to have been in regard to the Chancellor's location and availability based on Father's potential request for a temporary restraining order. Mother's counsel believes the time associated with these tasks to be reasonable and necessary." Thus, it appears that counsel for Mother was attempting to locate the trial judge in another county in the judicial district. As such, we cannot conclude that the trial court erred in including this time in its award of attorney's fees.

Father also takes issues with certain expenses. First, he objects that a matter was double billed because it was billed for travel time and mileage. In our view, time and mileage compensate for different expenses. Because Father has cited no authority to suggest that an attorney cannot be compensated for both, we can find no abuse of discretion in the trial court's decision to award both. Father also asserts that nearly $2,000.00 in expenses were excessive due to a lack of itemization. But Mother's counsel submitted ten pages of detailed itemized expenses in support of the total amount of $3,585.42. So we discern no abuse of discretion in the trial court's decision to award Mother expenses of that amount. We therefore affirm the trial court's decision to award Mother $52,640.00 in attorney's fees and $3,585.42 in expenses.

**C.**

Finally, Mother asserts that Father should be required to pay her attorney's fees incurred on appeal because this appeal is frivolous. *See* Tenn. Code Ann. § 27-1-122 ("When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result

of the appeal."). "A frivolous appeal is one that is devoid of merit or one that has no reasonable chance of succeeding." ***Young v. Barrow***, 130 S.W.3d 59, 67 (Tenn. Ct. App. 2003) (internal citation omitted). Although we have not ruled in Father's favor in this appeal, we do not deem his appeal frivolous. As such, we decline to award attorney's fees under section 27-1-112 in this case.

In the final sentence of her brief, Mother also asserts an alternative argument that "this Court should use its discretion in awarding her attorney's fees on appeal." Mother, however, cites no law for her request.[22] *See* ***Sneed***, 301 S.W.3d at 615. In the absence of cited authority in support of this request, and in the light of the substantial fees awarded in the trial court, we exercise our discretion to decline Mother's request that Father pay the attorney's fees she incurred in this appeal.

## V. CONCLUSION

The judgment of the Madison County Chancery Court is affirmed, and this cause is remanded to the trial court for further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant, Daemon Shaun Key, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[22] For example, Mother does not assert that she is entitled to fees under the attorney's fees provision of the relocation statute. *But see* ***In re McKayla H.***, No. W2020-01528-COA-R3-JV, 2023 WL 2809507, at \*19 (Tenn. Ct. App. Apr. 6, 2023) (awarding attorney's fees incurred on appeal under section 36-6-108(f)).